FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

'97 JUL 31  PM 4: 15

U.S. DISTRICT COURT
N.D. OF ALABAMA

BRIDGET HILL,                    )
                                 )
        Plaintiff,               )
                                 )
    vs.                          )    CIVIL ACTION NO.
                                 )
                                 )    CV 96-AR-2174-S
SATELLINK PAGING, INC.,          )
                                 )
        Defendant.               )

ENTERED

JUL 3 1 1997

## MEMORANDUM OPINION

The court has before it the motion of defendant, Satellink

Paging, Inc. ("Satellink"), for summary judgment.  Plaintiff,

Bridget Hill ("Hill"), an ex-employee of Satellink, alleges that

Satellink violated Title VII of the Civil Rights Act of 1964, *as*

*amended*, the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e, *et*

*seq.* ("Title VII"), 42 U.S.C. § 1981, and committed the Alabama

tort of outrage by engaging in hostile work environment racial

harassment and disparate treatment based on Hill's race.  Hill

concedes that her tort of outrage claim is due to be dismissed.

Finding that no genuine issues of material fact exist with

respect to her claims, disposition under Rule 56 is appropriate

as to the entire action.

### I. Pertinent Undisputed Facts

Hill, who is black, commenced working for Satellink in

1

November 1994.  David Massey ("Massey"), who is white and is senior vice-president of sales and marketing for Satellink, hired Hill as a receptionist.  Mark Solar ("Solar"), a white sales manager of Satellink's Birmingham office, was Hill's supervisor. Satellink promoted Hill to the position of customer service representative in November 1995, and five months thereafter, to the position of outside sales representative.  Hill tendered her resignation on March 11, 1997.

Hill, along with other Satellink employees, experienced problems with co-worker Gina Wooten ("Wooten"), a white female. Hill had regular contact with Wooten, who was likewise an outside sales representative.  Wooten did not get along well with any Satellink employee for any length of time.  For instance, Wooten often made rude comments and spoke disrespectfully to Dawn McDermott ("McDermott"), a white receptionist, and Mary Ozment ("Ozment"), a white administrative assistant.

Wooten complained to management about the conduct of co-workers toward her.  For instance, Solar issued an oral reprimand to Steven Thatch, a white outside sales representative, for calling Wooten a "bitch."  In addition, Solar issued an oral reprimand to Josh Wright ("Wright"), after Wooten reported that Wright said "fuck you, I need you to do this" in response to her refusal to assist him.

2

Hill also experienced continual conflicts with Wooten.  In January 1995, Wooten moved the location of the sign-in sheet on Hill's desk and made some smart remarks to Hill, including telling Hill that she did not do her job correctly.  In reaction, Hill went to Wooten's office and told Wooten that she was not her boss, did not sign her checks and could not tell her what to do. As a result of Hill's said conduct, Solar gave Hill a verbal warning.  Subsequently, in September 1995, Wooten and Hill had an altercation when Wooten picked up paper Hill was in the process of using to make copies and threw it across the room.  Wooten then told Hill that she was not going to pick up the paper.  Hill informed Solar of the incident, after which Solar told her to avoid Wooten.

On March 20, 1996, Hill had another verbal altercation with Wooten.  During this altercation, Hill told Wooten that she was being rude.  Wooten responded by saying something like "you don't want to try me today," to which Hill retorted "no, you don't want to try me today."  Wooten then followed Hill down a corridor and called Hill a "little black girl."  Hill responded by calling Wooten a "bitch."

Immediately thereafter, both women went to Massey's office to report the incident.  Because Massey was engaged in a meeting, Hill returned to her office.  After the meeting, Wooten entered

3

Massy's office and informed him and Solar that Hill called her a "bitch." Wooten then left the premises for the day. Massey and Solar then called Hill in to hear her side of the incident. In explaining her side, Hill told Massey and Solar that Wooten called her a "little girl." Hill did not inform them that Wooten used the phrase "little black girl."

Massey and Solar considered both Wooten's and Hill's explanation of the incident and determined that both women were at fault. Consequently, Solar drafted written reprimands for both women. Later in that day, March 20, 1996, Solar and Massey met with Hill, issued her a written warning and informed her that if she disagreed with the reprimand she could file a statement. Hill disagreed and filed a statement. Because Wooten had left the office for the day, Massey and Solar did not issue Wooten her written warning on the afternoon of March 20, 1996.

The next day, March 21, 1996, Hill arrived at work and found a note in her desk drawer which read "Die Nigger." She immediately contacted Massey, who upon notification directed Ozment to call the Hoover police department ("HPD"). Massey informed Hill that Satellink would do its best to find the person who wrote this note. Subsequently, Satellink let the HPD conduct the investigation.

When the police arrived, they interviewed every employee

4

except Wooten, who failed to report to work the morning of March 21, 1996.  The police instructed Satellink management to call them when Wooten reported to work and not to discuss the incident with her.  Wooten called the office later in the day and left a message stating that she was ill and would not be coming to work. Wooten did not return to work until March 27, 1996, stating that she had been sick.  Immediately upon Wooten's return to work, Massey called the HPD.  The police arrived soon thereafter and interviewed Wooten with respect to the "Die Nigger" note.  Wooten left the office after the interview and only returned twice, once to empty out her desk and once to tender her resignation.  She did not work during the two weeks from her resignation notice until her last day of employment, asserting that she was too ill.

After the note incident, Massey called an employee's meeting on March 26, 1997, wherein he informed all employees that Satellink would not tolerate racial harassment by its employees. Further, he instructed all employees that if anyone experienced or witnessed harassment of any kind at the Birmingham Satellink office to report it to him, Solar or someone in the Atlanta Satellink office.  Prior to this, the harassment policy was not posted at Satellink's Birmingham facility.

The HPD did not uncover evidence conclusively identifying who placed the racially threatening note.  However, Hill did not

5

encounter any racial comments or behavior after receiving the
March 21, 1996, note.[1]

## II. Analysis

### A. Rule 56

Rule 56 states, in pertinent part:

> The judgment sought shall be rendered forthwith if the
> pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any,
> show that there is no genuine issue as to any material fact
> and that the moving party is entitled to a judgment as a
> matter of law.

F. R. Civ. P. 56(c).  The obvious was stated by the Eleventh

Circuit as follows: "[s]ummary judgment is appropriate where

---

[1]The evidence reflects that Massey once in his life, repeated a joke
uttered by a black comedian on a television show(HBO), in which the word
"nigger" was used.  While Hill asserts that "Massey recalls a joke at work in
it that he I[sic] repeated the work[sic] nigger" (Hill's opposition to
defendants motion for summary judgment at 20), the evidence is clear that
Massey "does not recall whether [he] told a joke of that nature at work or
not."  (Hill's Evidentiary Submission at Ex. 2, at 80).  This court will
assume that Hill simply misunderstood Massey's recollection of where he
relayed the joke and did not intentionally mischaracterize the evidence.
    Furthermore, Massey's action, in repeating the joke, is not, in and of
itself, indicative of racial discrimination.  The court needs to look no
further than to a jury gone mad in a recent Milwaukee, Wisconsin case, wherein
the jury awarded an ex-employee $26 million for being fired because he told a
female employee about a sexually suggestive episode of the sit-com *Seinfeld*.
In fact, the same jury awarded plaintiff a $1.5 million judgment against the
woman who was allegedly harassed when she had to endure listening to the
story.  It appears to be a good thing Satellink did not fire Massey for
repeating the joke.  If it had, most assuredly some enterprising attorney
would have pounced.  It is actually surprising, given the turn of events in
Milwaukee, that someone has not yet sued Hill for crying foul with respect to
Massey's action.  But then again, the statute of limitations has probably not
expired.  *See* Attached Exhibit A.
    A more realistic if controversial, approach to childish behavior in the
workplace is found in *Oates v. Discovery Zone*, 116 F.3d 1161, 1997 WL 342883
(7th Cir. June 23, 1997), in which the Seventh Circuit found that a picture
depicting and African-American employee as a monkey, without more, did not
make out a *prima facie* case of race discrimination under Title VII.

there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994). Satellink has invoked Rule 56.

*B. Hostile Work Environment Racial Harassment*

Hill claims that she was subjected to a racially hostile work environment at Satellink. In order to create a hostile work environment, the conduct at issue must have "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S. Ct. 2399, 2404-05 (1986). To establish a prima facie case of hostile work environment Hill must demonstrate that: (1) she belongs to a protected class; (2) she was subject to unwelcome racial harassment; (3) the harassment was based on race; and (4) the harassment affected a term, condition, or privilege of employment. *See Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500, 1507, *aff'd*, 58 F.3d 640 (11th Cir. 1995)(citing *Henson v. Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982)). Furthermore, Hill must demonstrate that Satellink knew or through reasonable diligence should have known of the harassment and failed to take prompt and appropriate corrective action. *See Faragher v. City of Boca Raton*, 111 F.3d 1530, 1535 (11th Cir.

7

1997)(citing *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d
1311, 1316 (11th Cir. 1989)).  Because Satellink only argues that
Hill fails to establish elements four and five of her prima facie
case, this court will focus its analysis on those elements.

1. Term, Condition, or Privilege of Employment

     To establish the fourth element of her prima facie case Hill
must demonstrate that the harassment was sufficiently pervasive
so as to alter the conditions of her employment and create an
abusive environment.  *See Harris v. Forklift Systems, Inc.*, 510
U.S. 17, 21, 114 S. Ct. 367, 370 (1993).  This test is not
subject to mathematical computation or the drawing of a clear
line of demarcation fitting every case.  Thus, courts are to
consider the following factors when making such a determination:
(1) the frequency of the discriminatory conduct; (2) the severity
of such conduct; (3) whether the conduct was physically
threatening or humiliating; and (4) whether the conduct
unreasonably interfered with the worker's performance.  *Harris*,
510 U.S. at 20-22, 114 S. Ct. at 371.  "[T]he mere utterance of
an ethnic or racial epithet which engenders offensive feelings in
an employee does not affect the terms, conditions, or privileges
of employment to a sufficiently significant degree to violate
Title VII."  *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th
Cir. 1982); *see also Oates v. Discovery Zone, supra*, footnote 1.

8

Hill asserts that one racially discriminatory comment directed to her by Wooten and a racially threatening note directed to her by an unidentified party over a two day period give rise to her hostile environment claim. It is extremely difficult for this court to conjure up a scenario where two comments in two days would create a hostile work environment within the parameters established by *Meritor* and *Harris*. There is no doubt that the comments Hill endured are offensive and physically threatening. In addition, the fact that Hill had to take time away from her work to complain indicates that such comments had a disruptive effect on her work. However, the comments made to Hill had to be so "commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990). In the instant action, while it is clear that the comments were offensive and physically threatening, this court cannot hold that the frequency or severity of the comments created an atmosphere charged with racial hostility. *See McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996)(holding that three sexual comments over a three month period was not enough to create a hostile work environment).

## 2. Respondeat Superior

Even if this court were to agree with Hill that the terms,

9

conditions, and privileges of employment were unreasonably affected by the discriminatory conduct, this court would still find that Hill has failed to establish her *prima facie* case of hostile work environment. To establish the fifth element of her *prima facie* case Hill must demonstrate that the employer knew or should have known of the harassment and failed to take prompt remedial action. *See Faragher*, 111 F.3d at 1535 (11th Cir. 1997); *see also Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752 (11th Cir. 1996).[2]

Accordingly, this court turns to a determination of whether Satellink knew or should have known about the alleged harassment and failed to take prompt remedial action. It is undisputed that Satellink became aware and thus had actual knowledge of the incidents of alleged harassment after the occurrence of the "Die Nigger" note.[3]  Thus, the inquiry becomes whether it took prompt remedial action. "The 'remedial action' must be reasonably likely to prevent misconduct from recurring." *Kilgore*, 93 F.3d

---

[2]This is not a case in which an employee seeks to hold her employer indirectly liable for racial harassment by one who is acting as the employer. *See Kilgore*, 93 F.3d at 754, n.2; *see also Faragher*, 111 F.3d at 1535.

[3]The fact that Hill and Wooten engaged in verbal altercations prior to the racial comment made to Hill on March 20, 1996, and the racially disparaging note received by Hill on March 21, 1996, did not put Satellink on notice of racial harassment. The evidence clearly demonstrates that Hill did not encounter racial harassment prior to March 20, 1996, and did not report any racial harassment until March 21, 1996. While it is unfortunate that Hill and Wooten did not get along, the broad employment discrimination laws do not protect employees from cruel, malevolent or spiteful co-employees absent discrimination.

at 754 (quoting *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465
(7th Cir. 1990)).  This court finds that Satellink did undertake
prompt and appropriate remedial action in responding to Hill's
allegations.

Immediately upon being informed of the racially hostile note
and contemporaneously with the prior racial comment, Satellink
notified the HPD and brought them in to investigate the incident.
*See Hirras v. National R.R. Passenger Corp.*, 95 F.3d 396, 400
(5th Cir. 1996)(finding that defendant's actions in referring
complaints of harassment to proper authorities provided evidence
that defendant conducted a prompt and thorough investigation).
In addition, Satellink contacted its alarm service to determine
whether it could identify who entered the building the evening
before the threatening note was found.  Despite the efforts of
Satellink and the HPD, they were unable conclusively to identify
who left the racially hostile note.  Satellink and Hill share the
belief that the harasser was Wooten.  Since the incident on March
21, 1997, Hill has not worked with Wooten[4] and she has not been
subjected to any more allegedly racial comments.  *See Steele v.
Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir.
1989)(special importance attached to the fact that the harassment

---

[4]Wooten tendered her resignation shortly after the March 21, 1997,
incident and did not work another day, saying she was ill.

11

ended after the remedial action); *see also Robinson v.*
*Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1531 (M.D. Fla.
1991)("an employer can defend successfully by showing that the
conduct brought to the company's attention was not repeated after
the employer took action"). As a result, Satellink has taken
steps that not only were reasonably likely to prevent the conduct
from reoccurring, but that in fact did eradicate the problem that
Hill complained about. Accordingly, this court finds that Hill
has failed to meet the fifth element of her prima facie case so
that her racially hostile work environment claim is due to be
dismissed.

### C. Violation of Work Rules

Hill alleges that she was discriminated against by Satellink
because it treated similarly situated white employees differently
with regard to the alleged violation of the same work rule.  Hill
argues that Satellink reprimanded her for allegedly engaging in
inappropriate behavior toward Wooten, a white employee, but did
not reprimand Wooten and other white employees who engaged in the
same behavior.

In cases involving alleged racial bias in the application of
work rules, the prima facie case has been clearly delineated by
the Eleventh Circuit.  *See Jones v. Gerwens*, 874 F.2d 1534, 1540
(11th Cir. 1989).  Hill must establish that she is a member of a

12

protected class and must show either "(a) that she did not

violate the work rule, or (b) that she engaged in misconduct

similar to that of a person outside of the protected class, and

that disciplinary measures enforced against her were more severe

than those enforced against the other persons who engaged in

similar misconduct." *Jones*, 874 F.2d at 1540 (citing *Moore v.

City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir.), *cert.

denied*, 472 U.S. 1021, 105 S. Ct. 3489 (1985)).

Because Hill has established that she is a member of the

protected class and admits that she violated the pertinent work

rule, this court turns to whether she was subjected to more

severe discipline than employees outside the protected class who

engaged in the same misconduct.  Initially, Hill alleges that

numerous altercations occurred between her and Wooten and between

other employees and Wooten and that Wooten was not reprimanded

while the other party involved was.  Hill alleges that she had an

altercation with Wooten in January 1995, wherein Hill was given a

verbal warning to ignore Wooten but Wooten was not reprimanded.

Next, Hill points to evidence which reflects that two white

employees, Thatch and Wright, were given oral reprimands for

using profanity toward Wooten, while Wooten, who was accused by

Wright of using profanity, was not reprimanded.

In order for Hill to succeed with her disparate discipline

claim she must establish that she was treated more severely than similarly situated white employees. This she has failed to do. The initial fallacy in Hill's argument is that both she and white employees were reprimanded for "cussing." The evidence reflects that the management treated all employees, regardless of race, the same with respect to altercations with Wooten. Accordingly, Hill's argument that she was reprimanded while Wooten was not does not establish a prima_facie case of disparate discipline. The reason being that white employees were also disciplined for the same thing.

Next, the court turns to Hill's argument that Wooten should have been reprimanded for leaving the racially hostile note. This argument is meritless. After a thorough investigation by the HPD, the evidence did not identify with sufficient clarity who left the note. Hill argues that the law does not require Satellink conclusively to know who committed an act before the employer can discipline an employee for the act. This is true, but the law does not mandate that an employer discipline an employee with reckless abandon because, although not certain, it believes that that employee committed a work rules violation. Employers should not be penalized for proceeding with an abundance of caution before acting to discipline employees. Furthermore, in the instant action, Wooten tendered her

14

resignation without working another full day after the note incident.  As a result, Satellink did not even have an opportunity to administer discipline to Wooten.

This court turns to Hill's final argument, wherein she asserts that she was given a written reprimand for using profanity at work while white employees were only given oral reprimands.  The evidence reflects that in addition to giving a written reprimand to Hill, Satellink's management prepared written reprimands for at least two white employees, Wooten and Shelly Turner ("Turner"), for using inappropriate language at the office.  In fact, the written reprimand fashioned for Wooten was done so with respect to the same altercation in which Hill was given a written reprimand.  Furthermore, the evidence does not reflect that there exists a real difference in the severity between a written and an oral reprimand.  Accordingly, Hill has failed to demonstrate she was treated more severely than employees outside the protected class who engaged in the same misconduct and therefore failed to establish a prima facie case of disparate discipline.  Satellink's motion for summary judgment as to Hill's disparate discipline claim is due to be granted.

### III. Conclusion

The evidence and arguments submitted by the parties do not establish that any genuine issue of material fact exists with

15

regard to any of Hill's claims.  Because no genuine issues of
material fact exist and also because this court determines that
Satellink is entitled to judgment as a matter of law, Satellink's
Rule 56 motion is due to be granted.  A separate and appropriate
order will be so entered.

DONE this 31st day of July, 1997.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT COURT

16

EXHIBIT A

# sexual harassment

## Jury award means middle ground that much more elusive

Let an employee make sexual jokes at work, and you could lose millions of dollars in a lawsuit.

Fire an employee for making sexual jokes at work, and you could lose millions of dollars in a lawsuit.

Dinged if you do, dinged if you don't.

Last week, a Milwaukee jury of 10 women and two men awarded $26 million to a Miller Brewing Co. executive fired for telling a female co-worker about a sexy *Seinfeld* episode.

Jerold Mackenzie, 54, had sued for a measly $9.2 million. The jury



**Joanne Jacobs**

gave him nearly three times more than he asked for, including $18 million in punitive damages. They also ordered Patricia Best, a secretary who complained about the *Seinfeld* joke, to pay $1.5 million of the total amount.

### Won't be forgotten

The award will be reduced or thrown out, legal observers predicted. But it won't be forgotten.

It may just reflect a jury that went goofy, as juries sometimes do. But it could be the harbinger of a backlash against sexual harassment claims.

Mackenzie worked for the beer company for 19 years. By 1993, he was earning $95,000 a year. Then he told Best about an episode in which Seinfeld forgets his girlfriend's name, but remembers that it rhymes with a female body part. The cast of friends guesses various unlikely possibilities that rhyme with various sexual parts. After the woman dumps Seinfeld, he remembers that her name is Dolores.

Mackenzie was determined to make sure Best got the joke. To avoid saying the rhyming word, he showed her a photocopied page from the dictionary with "clitoris" on it.

She considered that sexual harassment, and also complained to management that he'd left a "freaky" voice mail message on her phone and told her about a dream he said he'd had about her.

Based on their post-verdict comments, the jury apparently believed Miller wanted to dump Mackenzie for other reasons, and used sexual harassment as an excuse. A decade of downsizing has made Americans increasingly hostile to employers who fire employees without good cause.

But they didn't just go after the deep-pocket defendant. They clobbered the secretary, too.

In sexual harassment c ses, the alleged victim usually argues she was unable to speak up because the harasser outranked her.

There were 10 women on the jury, and they just didn't buy the idea that women in the work place are helpless victims of big bad men. If Best was offended, she should have told Mackenzie so before he got to the punch line, a woman juror said.

Mackenzie doesn't sound all that sympathetic. (For one thing, he's a joke explainer.) Why was the jury so incredibly angry?

I think they were angry at the way sexual harassment law has been used to harass workers who want to talk about something at work other than the latest production figures. If workers are entitled to a comfortable working environment, that means — for most people — an environment where they can chat with co-workers about what was on TV last night, tell a joke, offer a compliment, maybe even make a date. It means an environment where they don't have to watch every word. These jurors must feel more oppressed by workplace censorship than workplace boorishness.

### Unfair and impossible

That $1.5 million judgment against Best is wildly unfair, and may scare women silent about sexual harassment, even when they've got a solid case.

For employers, the verdict makes a difficult issue impossible. What's a boss supposed to do to stay out of court?

There must be a sane middle ground between the multimillion-dollar swings of the pendulum. We haven't found it yet.

*Joanne Jacobs is a member of the San Jose (Calif.) Mercury News editorial board.*



Mackenzie had been reprimanded by Miller in 1989, after his secretary charged sexual harassment. He denied the charge, and the case was settled out of court.

This time, Mackenzie was fired.

The company said the incident was one of a series of "poor management decisions by Mackenzie."